UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| DISH NETWORK L.L.C. and<br>NAGRASTAR L.L.C., | )<br>)<br>) Case No. 4:17-cv-53 |
| *Plaintiffs*,<br>v. | )<br>) Judge Mattice/Steger<br>) |
| JAMES SIMMONS | )<br>) |
| *Defendant*. | ) |

### REPORT AND RECOMMENDATION

Before the Court for a report and recommendation under 28 U.S.C. § 636(b)(1)(B) and (C) is a Motion for Default Judgment [Doc. 13] filed by Plaintiffs DISH Network LLC and Nagrastar LLC (collectively "DISH") against Defendant James Simmons ("Simmons").

DISH asserts that Simmons unlawfully purchased, used, and resold server passcodes that bypassed their security system. These passcodes enabled him to receive encrypted, copyrighted, subscription-based audio, video, and data service programming without paying the requisite subscription fee [Doc. 1, ¶ 7]. Simmons failed to file an answer or otherwise respond to DISH's complaint [Doc. 1]. For that reason, DISH requests entry of judgment by default against Simmons under Rule 55(b)(2).

On June 21, 2018, the Court conducted a hearing to allow DISH to present argument as to why a default judgment should be entered and to present evidence concerning the timeliness of DISH's claims and the appropriate measure of statutory damages. Notices of the hearing were provided via U.S. Mail to Simmons on May 23, 2018 [Doc. 18] and on June 5, 2018 [Doc. 21]; however, Simmons did not appear at the June 21st hearing. The undersigned concludes that

1

Simmons simply ignored his obligation to appear at the hearing, just as he ignored his obligation to respond to the complaint filed against him.

In light of Simmons' willful disregard of the Court's directives and his failure to offer any defense to the allegations in the complaint, the undersigned **RECOMMENDS** that DISH's Motion for Default Judgment [Doc. 13] be **GRANTED.**

I. FACTS

DISH Network is a multi-channel video provider that delivers audio, video, and data services through a direct broadcast satellite system to 14 million customers in the United States and its territories [Doc. 1, ¶ 8]. DISH utilizes high-powered satellites to broadcast programming to consumers after they have paid the subscription fee or purchase price if the content is pay-per-view. *Id.* at ¶¶ 8-9.

DISH purchases the distribution rights for most of its programming from providers such as network affiliates, motion-picture distributors, pay and specialty broadcasters, cable networks, sports leagues, and other holders of programming rights. *Id.* at ¶ 10. The programming is copyrighted, and DISH has the authority of the copyright holders to protect these works from unauthorized reception and viewing. *Id.* at ¶ 11.

To prevent unauthorized use, DISH digitizes, compresses, and scrambles the programming before transmitting it to multiple satellites in orbit. Once sent, the satellites then relay the encrypted signal to customers' receivers.[1] *Id.* at ¶ 12. Each receiver has a smart card[2] that has a unique serial number used by DISH when activating the equipment to ensure that it only decrypts programming that customers purchased. *Id.* at ¶ 14. In short, the receiver and

---

[1] A DISH Network satellite television set consists of the following: a compatible dish antenna, receiver, smart card, television, and cabling [Doc. 1 at ¶ 13].

[2] NagraStar provides the smart cards and other security technologies that permit access to DISH Network's content.

2

Case 4:17-cv-00053-HSM-CHS   Document 26   Filed 06/28/18   Page 2 of 18   PageID #: 367

smart card convert DISH's encrypted satellite signal into viewable programming for the authorized subscriber. Conversely, these measures prevent unauthorized users from viewing the programming. *Id.* at ¶ 17.

In a sort of technological arms-race, piracy organizations, like Satlobo and Activia Centro, have discovered ways to circumvent DISH's security protocols. These "pirate" organizations steal DISH's programming through subscription-based Internet key sharing ("IKS") services that unscramble the encrypted programming without authorization. *Id.* at ¶ 21. Satlobo and Activia Centro sell the passcodes online, permitting end users to circumvent DISH's security and access copyrighted programming without paying the requisite subscription fee. *Id.*

At the June 21st hearing on the Motion for Default Judgment, the Court heard testimony from DISH's corporate representative, Mr. Bert Eichhorn, as to how DISH discovered records demonstrating that Simmons purchased illegal passcodes. Mr. Eichhorn testified that Satlobo and Activa Centro sold IKS Server Passcodes to a man named Stuart Camic a/k/a "Zoogor," who then resold these passcodes to a number of individuals, including Simmons. DISH first learned of this scheme when federal authorities raided Satlobo's headquarters and discovered business records reflecting that Satlobo sold IKS Server Passcodes to other re-sellers, one of whom was Stuart Camic. After conducting several undercover purchases from Mr. Camic, DISH representatives, including Mr. Eichhorn, interviewed him in April 2016. Faced with criminal prosecution, Mr. Camic agreed to cooperate with DISH and volunteered information and records demonstrating that he had resold IKS Server Passcodes to Simmons and others.

After reviewing Mr. Camic's records, DISH attempted to contact Simmons by letter on two occasions, but he did not respond. DISH then gave to their attorneys the evidence against Simmons, and the attorneys tried to contact Simmons for a third time. Counsel even included a

3

copy of the proposed complaint warning Simmons that DISH would file suit if he did not respond. Once again, Simmons ignored the letter.

After several months without a response, DISH filed the present complaint against Simmons on September 28, 2017, alleging that he violated the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a)(2); the Federal Communications Act ("FCA"), 47 U.S.C. § 605(e)(4); and the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1)(a) and 2520 [Doc. 1]. Specifically, DISH asserted that Simmons purchased "at least 56 IKS Server Passcodes between March 8, 2012, and April 16, 2015" to circumvent DISH's security system and receive satellite broadcasts of copyrighted programming without payment of the required subscription fee[3] [*Id.* at ¶ 22]. DISH also contends that Simmons used and resold some of the IKS passcodes [*Id.* at ¶¶ 23-24].

Simmons failed to respond to the complaint or otherwise defend this action despite being properly served with process [Docs. 5, 9].

On November 13, 2017, DISH applied for the Clerk's entry of default [Doc. 10], which the Clerk of Court entered on December 12, 2017 [Doc. 12]. DISH then filed its Motion for Default Judgment eight days later on December 20, 2017 [Doc. 13]. In their motion, DISH limited their request to Counts I and II of the Complaint, where they alleged violations of the Digital Millennium Copyright Act, 17 U.S.C. § 1201(a)(2), and the Federal Communications Act, 47 U.S.C. § 605(e)(4). Based on these violations, DISH requested a $1.17 million statutory-damages award. Notably, DISH submitted an affidavit from Stuart Camic testifying that he sold 117 IKS Server Passcodes to Simmons from March 2012 through November 2014. In addition to damages, DISH also sought a permanent injunction against Simmons prohibiting him from purchasing, using, or selling the passcodes.

---

[3] Each passcode was believed to be valid for one year's worth of programming [*Id.* at ¶ 22].

After DISH filed its Motion for Default Judgment, the Court requested that DISH submit findings of fact and conclusions of law describing the elements for each cause of action, the burden of proof, and the appropriate damages and fees [Doc. 16]. The Court also directed DISH to provide an affidavit from someone with personal knowledge attesting that Simmons was not an infant, not incompetent, and not a member of the military [*Id.*]. DISH timely attested to these facts [Doc. 17].

In reviewing DISH's Motion for Default Judgment – principally Camic's affidavit – it appears that Simmons purchased the majority of the IKS Server Passcodes well outside the three-year statute of limitations for claims under both the FCA and DMCA. *See* 17 U.S.C. § 507(b) (noting that civil actions arising under the DMCA and other provisions in Title 17 are subject to a three-year statute of limitations). *Kingvision Pay Per View Ltd., v. Wilson*, 83 F.Supp.2d 914, 916 (W.D. Tenn. 2000) (holding that claims under the FCA had a three-year statute of limitations in Tennessee based on application of state law). The undersigned thus requested that DISH file a supplement "addressing the issue as to why claims that arose outside of the applicable statute of limitations are not time barred" [Doc. 19]. DISH responded, arguing that its claims were timely since the discovery rule (*i.e.*, the statute of limitations does not begin to run until the injury is discovered or reasonably should have been discovered) tolled the limitations period [Doc. 20].

The Court then conducted an evidentiary hearing on June 21, 2018, on the issues of the appropriate measure of statutory damages and the timeliness of DISH's claims. At the hearing, DISH's representative, Mr. Eichhorn, testified as to how and when DISH uncovered the IKS Server Passcode scheme, the number of IKS Server Passcodes that Simmons purchased for resale, and DISH's efforts to contact Simmons about these issues. Mr. Eichhorn also provided background information on Simmons, testifying that he discovered through his investigation that

5

Case 4:17-cv-00053-HSM-CHS   Document 26   Filed 06/28/18   Page 5 of 18   PageID #: 370

Simmons owns and runs a small restaurant in Huntland, Tennessee.[4] Despite receiving sufficient notice of the hearing, Simmons did not appear. In fact, Simmons has failed to to take any steps to acknowledge receipt of the complaint or to defend this lawsuit.

## II. ANALYSIS

### A. Process for Obtaining a Default Judgment

Rule 55 governs both the process of a default and a default judgment. The rule contemplates a two-step process for obtaining a default judgment against a defendant who has failed to plead or otherwise defend. Rule 55(a) first requires a plaintiff to request from the Clerk of Court entry of default, describing the particulars of the defendant's failure to plead or otherwise defend. If the Clerk enters default, the plaintiff must then request that the Court to enter a default judgment under Rule 55(b).

Here, Simmons was properly served with a copy of the summons and complaint [Docs. 5, 9], but failed to file a responsive pleading or otherwise defend the lawsuit. The Clerk entered default against Simmons [Doc. 12] and mailed the entry of default to him at his address of record.[5]

Once the clerk enters the default, the defaulting party is deemed to have admitted all of the well-pleaded allegations in the complaint regarding liability. *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110–11 (6th Cir. 1995); *Ford Motor Co. v. Cross*, 441 F.Supp.2d 837, 846 (E.D. Mich. 2006) (citing *Visioneering Const. v. U.S Fid. and Guar.*, 661 F.2d 119, 124 (9th Cir. 1981)); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation – other than one relating to the amount of damages –

---

[4] Huntland is a small town in Franklin County, Tennessee with a population hovering around 1,000. *See* Huntland, Tennessee, http://www.huntland.org/ (last visited June 22, 2018).

[5] DISH Network also submitted affidavits that Simmons is not an infant, incompetent person, on active duty in the military, or otherwise exempted under the Servicemembers' Civil Relief Act [Doc. 17].

is admitted if a responsive pleading is required and the allegation is not denied."). This Court will therefore accept as true the well-pleaded allegations in DISH's Complaint [Doc. 1].

Granting a motion for default judgment lies "within the sound discretion of the court." *In re Irby*, 337 B.R. 293, 294 (Bankr. N.D. Ohio 2005) (applying *Federal Rule of Bankruptcy Procedure* 7055, which incorporates *Federal Rule of Civil Procedure* 55). And courts have recognized that "[i]t is fundamental that not all injuries are legally compensable; a tenet which may not be bypassed simply because a party fails to respond to a complaint. Thus, among the considerations a court is to employ when determining the propriety of entering a judgment by default is whether there exists a sufficient basis in the pleading for the judgment's entry; or similarly, whether a viable cause of action is alleged." *Id.* (citations omitted).

DISH seeks default judgment on Counts I and II, which allege that Simmons violated the Digital Millennium Copyright Act and the Federal Communications Act by intentionally intercepting DISH's satellite transmissions without paying the required subscription fees.

### B. DISH's Claim Under the FCA

Turning first to Plaintiffs' claims under Count II of the complaint [Doc. 1], DISH attempts to hold Simmons liable for violating the Federal Copyright Act, 47 U.S.C. § 605(e)(4), which makes it unlawful for any person to import or distribute any device or equipment while "knowing or having reason to know" that the device or equipment "is primarily of assistance in the unauthorized decryption of . . . direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a)." 47 U.S.C. § 605(e)(4).

Courts have held that DISH's satellite broadcasts are direct-to-home satellite services for purposes of § 605(e)(4). *See DirecTV, Inc. v. Webb*, 545 F.3d 837, 844 (9th Cir. 2008); *DirecTV, Inc. v. Huynh*, 503 F.3d 847, 852–53 (9th Cir. 2007); *Sonicview USA*, 2012 WL 1965279, at *10.

The FCA also applies to various piracy instruments including passcodes. *Dillion*, 2012 WL 368214, at *3–4 (finding that the DMCA and the FCA apply to piracy-enabling software files).

Accepting DISH's allegations as true, they establish that Simmons violated 47 U.S.C. § 605(e)(4) by trafficking in illegal passcodes. DISH alleges that upon "information and belief, [Simmons] has been importing, assembling, selling, or otherwise distributing IKS Server Passcodes in violation of 47 U.S.C. § 605(e)(4)" [Doc. 1, ¶ 33]. DISH also states that Simmons' violations were willful and "for purposes of commercial advantage and private financial gain." *Id.* at ¶ 35.

The Supreme Court has defined "willful" in civil statutes as conduct showing "disregard for the governing statute and an indifference to its requirements." *Transworld Airlines, Inc. v. Thurston*, 469 U.S. 111, 127 (1985). Courts have identified "willful" conduct under § 605 where there were repeated violations over time, or there was a sophisticated understanding of the satellite-programming industry, and there was a violation of the statutes that regulate such conduct. *Cable/Home Commc'n Corp. v. Network Prod.*, 902 F.2d 829, 851 (11th Cir. 1990); *Home Box Office v. Champs of New Haven, Inc.*, 837 F.Supp. 480, 484 (D. Conn. 1993).

The Court finds that DISH 's allegations are sufficient to support a claim of relief under 47 U.S.C. § 605(e)(4). Based on the volume of purchased IKS Server Passcodes, Simmons willfully violated the FCA because he knew or should have known that the codes were unlawful.

### C. DISH's Claims Under the DMCA

Plaintiffs also made a claim under the Digital Millennium Copyright Act, 17 U.S.C. § 1201(a)(1) and (2) in Count I of the complaint [Doc. 1]. At the evidentiary hearing, counsel for DISH differentiated between the FCA and the DMCA, noting that the FCA's provision in 47 U.S.C. § 605(e)(4) has a *scienter* element whereas the DMCA does not require intent or knowledge of wrongdoing. *Compare* 47 U.S.C. § 605(e)(4) *with* 17 U.S.C. § 1201.

8

Congress enacted the DMCA in 1998, creating a civil cause of action for the circumvention of copyright-protection systems. 17 U.S.C. § 1201. The DMCA prohibits trafficking in any technology, or service that:

> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a [copyrighted] work . . . ;
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a [copyrighted] work . . . ; or
>
> (C) is marketed . . . for use in circumventing a technological measure that effectively controls access to a [copyrighted] work . . . .

17 U.S.C. § 1201(a)(2).

Circumventing technological measures, as defined in the DCMA, "means to descramble a scrambled work, to decrypt an encrypted work, or to otherwise avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). A technological measure "effectively protects a right of a copyright owner" if, "in the ordinary course of its operation," it "prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title." 17 U.S.C. § 1201(b)(2)(B).

Courts have held that encryption-based security systems, like the ones at issue here, constitute a valid access control measure for DMCA purposes. *See DISH Network L.L.C. v. Sonicview USA, Inc.*, No. 09-CV-1553-L(WVG), 2012 WL 1965279, at *8 (S.D. Cal. May 31, 2012); *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 318 (S.D.N.Y. 2000) (holding that security measures based on "encryption or scrambling" are effective for purposes of the DMCA). Courts have likewise ruled that the DMCA applies to passcodes and other piracy instruments. *DISH Network LLC v. DiMarco*, No. 2:11-CV-01962, 2012 WL 917812, at *5 (D. Nev. Mar. 14, 2012) (finding the DMCA applicable to the distribution of passwords used to

9

access IKS servers); *DISH Network LLC v. Dillion*, No. 12-CV-157 BTM(NLS), 2012 WL 368214, at *3-4 (S.D. Cal. Feb. 3, 2012) (finding that the DMCA and the FCA apply to piracy-enabling software files).

DISH has made a *prima facie* showing that they are entitled to default judgment under the DMCA. According to DISH, Simmons "has been importing, offering to the public, providing, or otherwise trafficking in IKS Server Passcodes . . . [that] are primarily designed and produced for circumventing" DISH's security controls [Doc. 1, ¶¶ 28-29]. DISH also maintains that the passcodes have "no commercially significant purpose or use other than to circumvent" their controls [*Id.* at ¶ 29]. As a result of Simmons' actions, DISH contends that it was injured through the deprivation of subscription and pay-per-view revenues [*Id.* at ¶ 25]. Accepting DISH's claims as true, DISH is entitled to relief under the DMCA. *See* Fed. R. Civ. P. 8(b)(6).

### D. DISH's Entitlement to Statutory Damages

Having established that Simmons is liable to DISH under the FCA and DMCA, the undersigned will now address the issue of damages. There is a discrepancy between the allegations in DISH's Complaint and those in the Motion for Default Judgment. In its Complaint, DISH asserts that Simmons purchased "at least 56 separate IKS Server Passcodes . . . ." [Doc. 1 at ¶ 22]. But in its Motion for Default Judgment, DISH contends that Simmons "trafficked in at least 117 IKS Server Passcodes" [Doc. 14]. The FCA contains a provision allowing an aggrieved party to recover "statutory damages in a sum not less than $10,000, or more than $100,000, as the court considers just." *See* 47 U.S.C. §§ 605(e)(3). Applying the $10,000 figure to the 117 IKS Server Passcodes allegedly trafficked by Simmons, DISH asserts a claim for $1.17 million in statutory damages.

The Court notes, however, that Rule 54(c) provides that a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P.

10

54(c). *See Cty. of Suffolk v. Golden Feather Smoke Shop, Inc.*, No. 09CV162CBAVMS, 2016 WL 1245001, at *5 n.4 (E.D.N.Y. Mar. 23, 2016) ("Although the County urges the Court to look outside the four corners of the complaint in assessing liability, the law is clear that in evaluating a default judgment motion[,] the Court is limited to the non-conclusory, factual allegations in the complaint.")[6]

Consequently, the Court will look only to the four corners of the complaint to assess the total number of violations. In the complaint, Simmons is charged with purchasing only 56 IKS Server Passcodes, not 117.

Applying the FCA's minimum penalty of $10,000 multiplied by 56 violations, Simmons would face a potential judgment of $560,000. But this amount seems too high. Based on an affidavit provided by Gregory Duval, the chief operating officer for NagraStar, the injury to DISH "includes a loss of programming revenues that would ordinarily be received from legitimate subscribers, which are approximately $84 per month on average" [Doc. 13-1, PageID #: 45]. So, in this instance, the annual loss to DISH occasioned by consumers' use of the 56 pirated IKS Server Passcodes would be around $56,448.00.[7] *See Cengage Learning, Inc. v. Shi*, No. 13CV7772-VSB-FM, 2015 WL 5167775, at *4 (S.D.N.Y. Sept. 3, 2015), *report and recommendation adopted*, No. 13 CIV. 7772 (VSB), 2017 WL 1063463 (S.D.N.Y. Mar. 21, 2017) (noting that statutory damages under the FCA "should bear some relation to actual

---

[6] *See also Johannes Baumgartner Wirtschafts-Und Vermogensberatung GmbH v. Salzman*, 969 F. Supp. 2d 278, 287 (E.D.N.Y. 2013) (finding that the magistrate judge erred in considering exhibits that were not attached to or referenced in the complaint in recommending entry of a default judgment); *Silge v. Merz*, 510 F.3d 157, 160 (2d Cir. 2007) ("By limiting damages to what is specified in the 'demand for judgment,' [Rule 54(c)] ensures that a defendant who is considering default can look at the damages clause, satisfy himself that he is willing to suffer judgment in that amount, and then default without the need to hire a lawyer.").

[7] The undersigned computed the $56,448.00 total by multiplying DISH's $84 monthly loss in fees x 56 IKS Server Passcodes x 12 months since each passcode was valid for one year of programing.

damages suffered."). Given that the loss to DISH was around $56,000, the undersigned cannot reconcile a penalty of statutory damages that is ten times the estimated loss. *See id.*

Further, in response to the Court's inquiry, Plaintiffs' counsel indicated that Simmons is a small business owner in a rural community, and whatever judgment the Court enters will likely not be dischargeable in bankruptcy. *See, e.g.*, *In re Karpkinsy*, 328 B.R. 516, 527 (Bankr. E.D. Mich. 2005) (noting that Defendant's illegal piracy of satellite transmissions constituted "larceny under 11 U.S.C. § 523(a)(4) and a willful and malicious injury to Plaintiff under 11 U.S.C. § 523(a)(6) and, therefore, Defendant's entire debt to Plaintiff – including the statutory damages awarded – is non-dischargeable pursuant to those sections.").

Conceding that a $10,000 penalty per violation could be deemed excessive, Plaintiffs' counsel volunteered that a more reasonable approach might be to award statutory damages under the DMCA. 17 U.S.C. § 1203(c)(3)(A) outlines damages for each DMCA violation, which are "in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service . . . ." Relying upon the DMCA as the basis for a damages award, DISH requested the Court to award statutory damages of $2,500 for each of Simmons' violations.

The Court finds that DISH's concession under the DMCA is well-taken. Courts have, under the DMCA, "wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Echo Star Satellite LLC v. Viewtech, Inc.*, No. 07cv1273 BEN (WVW), 2011 WL 1522409, at *3 (S.D. Cal. Apr. 20, 2011) (quoting *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990)). When determining the amount of damages for each violation, courts consider the willfulness of the conduct as well as the need for deterrence. *See Sony Computer Entm't Am., Inc. v. Filipiak*, 406

F. Supp. 2d 1068, 1074-75 (N.D. Cal. 2005); *Tracfone Wireless, Inc. v. SND Cellular, Inc.*, 715 F. Supp. 2d 1246, 1261-62 (S.D. Fla. 2010).  Within the context of § 1201(a)(2), "willful" means acting with knowledge that the product is designed or used for circumvention. *See Filipiak*, 406 F. Supp. 2d at 1075 (citing *Dolman v. Agee*, 157 F.3d 708, 715 (9th Cir. 1998)).

There is no question that Simmons' misconduct was willful.  The evidence is that he purchased a large number of IKS Server Passcodes to circumvent DISH's security protocols and avoid the attendant subscription fees charged by DISH.  Simmons was involved in a scheme to "steal" service from DISH and to help others do the same.  Then, when DISH learned of Simmons' conduct and wrote letters requesting immediate cessation, he ignored their requests.  Finally, despite being served with a federal court complaint and notified of various proceedings, Simmons has completely ignored his obligation to participate in the lawsuit pending against him.  There is sufficient justification to penalize Simmons for his conduct.

Moreover, the amount of the penalty should also be calculated to deter Simmons and others from repeating this conduct.  DISH has invested enormous amounts of money in developing and implementing the technology required to provide its services to consumers.  The subscription fees that it charges consumers allow it to recover its sunken costs and improve services and products for future consumers.  When Simmons' obtained a large volume of IKS Server Passcodes, he did so for the purpose of selling those passcodes to put money in his own pocket and help other consumers avoid paying subscription fees to DISH.  Without knowing how much Simmons charged other consumers for the passcodes, it is reasonable to assume that he made thousands of dollars on this scheme.  The amount of the judgment against Simmons should wipe out any profit he realized from his illegal scheme, deter him from repeating this conduct in

13

the future, and send a strong message to other would-be IKS Server Passcode "pirates" that they, too, may be subject to significant penalty for stealing DISH's service.

For those reasons, the undersigned finds that the DMCA's statutory damages of no "more than $2,500 per act of circumvention, device, product, component, offer, or performance of service" is an appropriate award. *See* 17 U.S.C. § 1203(c)(3)(A). Multiplying $2,500 by a factor of 56 violations yields a product of $140,000.00. Consequently, the undersigned **RECOMMENDS** that judgment in the amount of $140,000.00 be entered on behalf of Plaintiffs against Simmons in this case.[8]

### E. Permanent Injunction

In addition to statutory damages, DISH also requested a permanent injunction under Rule 65 and the DMCA. *See* Fed. R. Civ. P. 65; 17 U.S.C. § 1203(b)(1) ("the court . . . may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation"). To obtain relief via a permanent injunction, plaintiffs must show the following:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

#### 1. Irreparable Harm and Inadequacy of Monetary Damages

DISH relies upon the declaration of Gregory Duval, the chief operating officer for NagraStar, to support irreparable harm [Doc. 13-1, PageID #: 39]. Mr. Duval's declaration states that DISH invests millions each year in security to protect against unauthorized viewing of copyrighted programming [*Id.* at ¶ 18]. The acts of Simmons and others in trafficking IKS

---

[8] DISH Network is not requesting an award of attorneys' fees or costs, which are discretionary under the DMCA but mandatory under the FCA. *See* 17 U.S.C. § 1203(b)(4)–(5); 47 U.S.C. § 605(e)(3)(B)(iii).

Server Passcodes undermine DISH's security protocols and result in costly security upgrades [*Id.* at ¶ 19]. Mr. Duval notes that a precise determination of lost profits is not feasible due to the nature and extent of programming received through these passcodes [*Id.*]. DISH argues that calculating reputational damage and lost sales is virtually impossible, and that these difficulties support the argument that DISH has been irreparably harmed and that monetary damages are inadequate. *See Tom Doherty Assoc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37–38 (2d Cir. 1995) (noting that "a loss of prospective goodwill can constitute irreparable harm"); *see also Coxcom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008) (granting permanent injunction and finding irreparable harm based on the relative inability to detect cable piracy and the magnitude of lost programming revenues); *DISH Network L.L.C. v. Whitcomb*, No. 11-CV-0333 W (RBB), 2011 WL 1559825, at *3 (S.D. Cal. Apr. 25, 2011) (concluding that lost profits and subscribers resulting from the sale of DISH Network piracy devices constitutes irreparable harm); *Macrovision v. Sima Prods., Corp.*, No. 05 Civ. 5587 (RO), 2006 WL 1063284, at *3 (S.D.N.Y. Apr. 20, 2006) ("If [the plaintiff] is unable to prevent the circumvention of its technology, its business goodwill will likely be eroded, and the damages flowing therefrom extremely difficult to quantify."). The undersigned agrees that DISH has demonstrated irreparable harm and the inadequacy of monetary damages resulting from pirating and reselling IKS Server Passcodes.

### 2. Public Interest and Balancing Hardships

The Court must also consider the balance of hardships as well as the public interest.

As to hardship, Simmons would suffer no legitimate loss if the Court issues the injunction. *See Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("[The defendant] cannot complain of the harm that will befall it when properly forced to desist from its

15

Case 4:17-cv-00053-HSM-CHS   Document 26   Filed 06/28/18   Page 15 of 18
PageID #: 380

infringing activities."). The Court would simply be ordering Simmons not to pirate IKS Server Passcodes – an activity already prohibited by law.

Further, the public interest is served by enjoining activities that violate federal law. *See Whitcomb*, 2011 WL 1559825, at *4 (noting the strong public interest in the enforcement of the DMCA) (citing *Coxcom*, 536 F.3d at 112). Permanently enjoining Simmons will also serve the public interest by safeguarding copyright protections and advancing the goal of copyright law to "prevent[ ] the misappropriation of the skills, creative energies, and resources which are invested in the protected works." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983). In contrast, allowing Simmons to continue trafficking in IKS Server Passcodes does not benefit the public. *See Grokster*, 518 F. Supp. 2d at 1223 ("Certainly, the public does not benefit from [the defendant's] inducement of infringement.").

All factors weigh in favor of issuing a permanent injunction against Simmons. Courts have broad discretion under Rule 65 to "to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990). The DMCA also authorizes courts to grant a permanent injunction on such terms as it deems reasonable to prevent or restrain a violation of the statute. *See* 17 U.S.C. § 1203(b)(1).

DISH requests that the Court permanently enjoin Simmons as well as anyone acting in active concert or participation with him [Doc. 14, PageID #: 226]. DISH also notes that "[p]ermanent injunctions have been entered in similar cases on essentially the same terms" *Id*. (citing *Sonicview USA*, 2012 WL 1965279, at *14; *Viewtech*, 2011 WL 1522409, at *4).

But in both referenced cases, the court only enjoined the named defendants from engaging in such conduct – not non-parties. *See Sonicview USA*, 2012 WL 1965279, at *14; *Viewtech*, 2011 WL 1522409, at *4. In this case, DISH expanded its request to enjoin Simmons and "anyone acting in active concert or participation with Defendant" from engaging in the conduct described. Because the non-parties have not had the opportunity to defend themselves in a legal proceeding, the Court **RECOMMENDS** that the proposed injunction is appropriate as to Simmons only, not individuals outside the scope of this case.

### III. CONCLUSION

In sum, it is **RECOMMENDED** that DISH's Motion for Default Judgment [Doc. 13] be **GRANTED**, and judgment be entered in Plaintiffs' favor for Simmons' violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201(a)(2).

It is further **RECOMMENDED** that DISH Network be awarded $2,500 for each of Simmons' 56 DMCA violations, totaling $140,000.00.

Finally, the undersigned **RECOMMENDS** the following permanent injunction:

Defendant James Simmons is permanently enjoined from:

- manufacturing, importing, offering to the public, providing, or otherwise trafficking in IKS Server Passcodes, any other code or password used in accessing an IKS server, and any other technology or part thereof that is used in circumventing DISH Network's security system or receiving DISH Network programming without authorization;

- circumventing or assisting others in circumventing the DISH Network security system, or receiving or assisting others in receiving DISH Network's satellite signal without authorization; and

- testing, analyzing, reverse engineering, manipulating, or extracting code, data, or information from DISH Network's satellite receivers, smart cards, satellite stream, or any other part or component of the DISH Network security system.

The Clerk of Court is **DIRECTED** to send Simmons a copy of this report and recommendation by First-Class U.S. Mail to his last-known address.[9]

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[9] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b). Failure to file objections within the time specified constitutes a waiver of the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370 (6th Cir. 1987).